No. 22-1776

---

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

---

KAREN ZARZA

Plaintiff-Appellant,

v.

Board of Regents of the
UNIVERSITY OF MICHIGAN
Defendant-Appellee,

---

On Appeal from the United States District Court
For the Eastern District of Michigan
Docket No. 18-13862-AJT-DRG

**APPELLANT'S BRIEF
ORAL ARGUMENT REQUESTED**

Michael N. Hanna
Adria Lynn Sylva
**Morgan & Morgan P.A**.
2000 Town Center, Suite 1900
Southfield, MI 48075
(313) 251-1399
MHanna@forthepeople.com

*Attorneys for Plaintiff-Appellant*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Sixth Circuit Rule 26.1, Plaintiff-Appellant makes the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?

Answer: No

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

Answer: No

Dated: November 14, 2022

*<u>S/ Michael N. Hanna</u>*
Michael N. Hanna
*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ..................................................................... iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT .......................................... vi

STATEMENT OF JURISDICTION .............................................................. 1

STATEMENT OF ISSUES FOR REVIEW ...................................................... 1

COURSE AND DISPOSITION OF PROCEEDINGS BELOW ............................... 2

STATEMENT OF THE CASE ...................................................................... 3

STATEMENT OF FACTS ........................................................................... 5

   I.  Background ................................................................................. 5

   II.  Zarza Opposed UM's Illegal Discrimination Against Taylor .......................... 7

      a.  May 11, 2017 Meeting with Lawter, Miller, and Sawicki evidences Lawter's retaliatory intent ................................................................... 7

      b.  May 16, 2017 email evidences Brancheau and Owens' retaliatory intent. .......... 9

      c.  UM admittedly failed to investigate Zarza's disability advocacy discrimination complaints ................................................................ 9

   III. UM retaliates against Zarza and conducts a pretextual misconduct investigation. 11

      a.  Brancheau's post-investigation instructions prohibited Zarza from addressing her sham investigative findings ................................................. 12

   IV. Zarza submits multiple written complaints that UM admittedly did not investigate ................................................................................. 13

      a.  UM admittedly fails to investigate Zarza's Complaint ............................... 15

      b.  UM attempts to cover up its failure to investigate Zarza's retaliation Complaint 16

   V.  UM presented Zarza a settlement offer with a general release, but Zarza refused. 17

   VI. UM's sham DRC was conducted by individuals that Zarza submitted disability discrimination/retaliation complaints against ......................................... 18

   VII.     UM retaliated against Zarza and terminated her employment. ............... 20

SUMMARY OF ARGUMENT .................................................................... 21

STANDARD OF REVIEW ......................................................................... 22

I.  The District Court erred because it sua sponte Dismissed Zarza's lawsuit for failure to provide sufficient evidence of pretext even though UM never argued that Zarza failed to provide sufficient evidence of pretext. .............................. 23

II. Zarza provided sufficient evidence of pretext. ................................ 26

    a.  No basis in fact. ............................................................. 27

      i.  Zarza did not bully Scott Price ................................................ 28

      ii. Zarza did not bully the temporary staff. ................................... 32

      iii. Zarza did not violate confidentiality guidelines. ....................... 35

      iv. Zarza did not bully her staff. ................................................ 35

    b.  UM's proffered reason is not the actual reason. .......................... 38

      i.  The temporal proximity evidences pretext. ............................... 38

      ii. UM's language evidences that its proffered reason is not the actual reason for termination .............................................................. 39

      iii. UM's failure to investigate Zarza's harassment/retaliation complaints is evidence of pretext. .................................................... 40

      iv. UM's investigation concerning the complaints brought against Zarza is evidence of pretext. ...................................................... 41

      v.  UM's DRC is evidence of pretext ............................................. 44

    c.  UM's proffered reason is insufficient to explain Zarza's termination ............ 48

      i.  Christmas Eve Breaks ......................................................... 48

      ii. UM's "bullying" complaints are insufficient to justify Zarza's termination. 48

      iii. Zarza did not bully the temporary staff. .................................. 50

      iv. Disgruntled employee complaints are insufficient to justify termination. .... 51

III. District Court erred in making credibility determinations in the light most favorable to UM ............................................................... 52

CONCLUSION/ PRAYER FOR RELIEF ............................................. 54

# INDEX OF AUTHORITIES

## Cases

*Adams v. Metiva,* 31 F.3d 375, 378 (6th Cir.1994) ............................................... 22

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ................................ 2, 23, 52

*Asmo v. Keane, Inc.*, 471 F.3d 588, 596 (6th Cir. 2000) ............................ 28, 38, 53

Celotex Corp. v. Catrett, 477 U.S. 317, 326, (1986) ............................................ 25

*Corner v. Fort Gordon Bus Co.,* 761 F.2d 1495, 1500 (11th Cir. 1985)............... 36

*Craig v. Bridges Bros. Trucking, LLC,* 823 F.3d 382 (6th Cir. 2016) ................... 22

*DeFreitas v. Horizon Inv. Mgmt. Corp*., 577 F.3d 1151, 1161 (10th
    Cir. 2009)................................................................................................... 29

*Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1112 (2nd Cir. 1988) .............. 26

*Duchon v. Cajon Co*., 791 F.2d 43, 46 (6th Cir. 1986).....................................41, 48

Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98,
    105 (6th Cir.1995) ...................................................................................... 25

*Gribcheck v. Runyon,* 245 F.3d 547 (6th Cir.2001)............................................... 27

*Heaton v. The Weitz Co., Inc.*, 534 F.3d 882, 890-891 (8th Cir 2008)................... 54

*Hurlbert v. St. Mary's Health Care System, Inc.,* 439 F.3d 1286, 1299
    (11th Cir. 2006)........................................................................................32, 44

*Johnson v. Arkansas State Police*, 10 F.3d 547, 554 (8th Cir. 1993) ...................... 47

*Jones v. Bessemer Carraway Med. Ctr.,* 151 F.3d 1321, 1323 n. 4 (11th
    Cir. 1998).................................................................................................... 39

*Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652,
    661 (6th Cir. 2020) ..................................................................................... 26

*Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th
    Cir. 1994).................................................................................................... 49

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)................................5, 24

*Meeks v. Computer Assocs. Int'l.,* 15 F.3d 1013, 1021 (11th Cir.1994)................. 53

*Miller v. WFLI Radio, Inc*., 687 F.2d 136 (6th Cir. 1982) .................................... 25

*Moffat v. Wal-Mart Stores, Inc.,* 624 Fed.Appx. 341, 348 (6th Cir.
    2015) ........................................................................................................... 26

*Petty v. Metro. Gov't of Nashville-Davidson Cty.*, 538 F.3d 431, 438
    (6th Cir. 2008)............................................................................................. 22

*Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011) ................. 26

*Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir.
    2006) ........................................................................................................... 38

*Reeves v. Sanders Plumbing Products, Inc.*, 530 U.S. 133 (2000)........................ 27

*Roberts v. Gadsden Memorial Hospital*, 835 F.2d 793, 798 (11th Cir 1988) ........................................................................................ 37

*Scott v. Harris*, 550 U.S. 372, 378 (2007) ........................................... 22

Shelby Cnty. Health Care Corp., 203 F.3d 926, 931 (6th Cir. 2000).................... 25

*Singfield v. Akron Metro. Hous. Auth*, 389 F.3d 555, 564 (6th Cir. 2004) .................................................................................... 23

*Strothers v. City of Laurel, Maryland,* 895 F.3d 317, 330 (4th Cir. 2018) ...................................................................................... 53

*Taylor v. Univ. of Michigan*, No.2:17-cv-11473, (E.D.Mich. Aug. 8, 2019) ...................................................................................... 43

*Tipton v. Canadian Imperial Bank,* 872 F.2d 1491, 1494 (11th Cir.1989)................................................................................. 53

*Tisdale v. Federal Exp. Corp.*, 415 F.3d 516, 529-30 (6th Cir. 2005).................. 42

*Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016) ........................................ 22

*Trs. Of Resilient Floor Decorators Ins. Fund v. A & M Installations, Inc.*, 395 F.3d 244, 247-48 (6th Cir. 2005) ....................................... 22

*Turcar, LLC v. I.R.S.,* 451 F. App'x 509, 513 (6th Cir. 2011)............................ 25

*USPS Bd. of Governors v. Aikens,* 460 U.S. 711, 716 (1983) ......................... 23

*Village of Arlington Heights v. Met. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)................................................................................. 45

*Vincent v. Brewer Co.*, 514 F.3d 489, 497 (6th Cir. 2007).................................. 26

*Watford v. Jefferson County Public Schools*, 870 F.3d 448 (6th Cir. 2017) ...................................................................................... 40

*Zisumbo v. Ogden Regional Medical Center*, 801 F.3d 1185, 1201 (10th Cir. 2015)........................................................................... 40

## Statutes

28 U.S.C. § 1291 ................................................................................ 1

28 U.S.C. §1331 ................................................................................. 1

29 U.S.C. § 701 ................................................................................. 2

## Rules

Fed.R.Civ.P. 56(c).............................................................................. 22

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Plaintiff-Appellant requests oral argument to address any questions the Court may have after reviewing the briefs and the record, and to respond to any arguments raised by Defendant-Appellee in their response brief or in oral argument. Plaintiff believes oral argument would assist the Court in rendering its decision on the important issues raised in this matter.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction over this case pursuant to 28 U.S.C. §1331. Plaintiff's wrongful termination lawsuit is brough pursuant to the Rehabilitation Act of 1973.

The Court of Appeals has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1291. On August 2, 2022, the District Court issued a final order granting summary judgment and entered final judgment. R. 54, 55. On August 31, 2022, Plaintiff timely filed a timely notice of appeal. R.56.

## STATEMENT OF ISSUES FOR REVIEW

1.    Whether Plaintiff-Appellant presented sufficient evidence of pretext in response to a Motion for Summary Judgment to create a material disputed issue of fact.

2.    Whether the District Court erred in Granting Defendant-Appellee's Motion for Summary Judgment where Defendant-Appellee did not move for Summary Judgment and/or argue that Plaintiff-Appellant did not present sufficient evidence of pretext.

3.    Whether a reasonable juror could find that Plaintiff-Appellant's evidence of a failure to investigate complaint of harassment/retaliation as evidence of pretext and/or intentional discrimination/retaliation.

4.    Whether a reasonable juror could find that an insufficient and/or

retaliatory investigation is evidence of pretext and/or intentional discrimination/retaliation.

     5.     Whether an employer's failure to follow policy is evidence of intentional retaliation and/or pretext.

     6.     Whether the district court weighed evidence in the light most favorable to the Defendant-Appellee in contravention of *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986).

     7.     Whether the district court made credibility determinations in contravention of *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986).

## COURSE AND DISPOSITION OF PROCEEDINGS BELOW

     Plaintiff filed her retaliatory termination lawsuit regarding violations of, *inter alia*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 ("Section 504"), *et. seq.,* on December 12, 2018. [R.1]. Defendant moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. [R.44]. Plaintiff opposed Defendant's Motion and supported her opposition with deposition testimony and documentary evidence that Defendant's termination was retaliatory. [R.48]. Defendant submitted a Reply brief. [R. 51].

     Throughout the course of litigation, the Honorable Judge Tarnow presided over this lawsuit. Judge Tarnow passed away on January 21, 2022. On February 16, 2022, this matter was reassigned to the Honorable Judge Cleland. On March 23,

2022, the District Court entered a Notice of Hearing. R. 52.  On June 1, 2022, the

District Court entered a Text Order Notice of Hearing Cancelled. On August 2, 2022,

the District Court Granted Defendant's Motion for Summary Judgment, and entered

final judgment. [R. 54, 55]. Plaintiff timely filed a notice of appeal on August 31,

2022. [R. 56].

## STATEMENT OF THE CASE

This is a retaliatory termination lawsuit brought under Section 504 of the

Rehabilitation Act ("Rehabilitation Act").  Plaintiff-Appellant, Karen Zarza[1]

(hereafter "Zarza") was a soft-spoken custodial supervisor who worked for

Defendant-Appellee, the University of Michigan (hereinafter "UM") for 14 years.

Throughout that time, Zarza did not have any documented discipline.

On May 8, 2017, one of Zarza's former subordinate employees, Robert Taylor

("Taylor") filed a *pro se* disability discrimination lawsuit. Zarza believed in good

faith that Taylor was wrongfully terminated because UM refused to accept his

medical documentation and failed to accommodate him by reassigning him to a

vacant position as required by a consent decree entered in another matter between

the UM and the U.S. Department of Justice ("DOJ"). Three days after Taylor filed

his federal lawsuit, Zarza set up a meeting with UM to discuss the circumstances

---

[1] Plaintiff-Appellant Karen Zarza passed away on August 8, 2021. Her son, Joshua
Zarza, has been substituted as a party in interest. [R. 50, Page ID.1333].

surrounding Taylor's termination, advised UM of her good faith belief that UM failed to accommodate Taylor and discriminated against him based on his disability, and that she would not perjure herself as a witness in Taylor's lawsuit.

UM failed to investigate Zarza's complaint of disability discrimination concerning Taylor. Instead, UM began a paper trail of alleged "performance concerns" from issues that purportedly stemmed from years prior to her advocacy on behalf of Taylor. The same supervisor that was willing to stick her neck out and advocate on behalf of a former disabled subordinate employee was delineated as a mean supervisor who bullied her subordinates based on subjective complaints incapable of objective evaluation.

Zarza objected to UM's retaliation on numerous documented occasions, but UM undisputedly ignored and otherwise failed to investigate these retaliation complaints. Instead, UM offered Zarza a settlement if she agreed to resign; thereby enabling UM to depict her as a disgruntled former employee by the time she testifies in Taylor's lawsuit. When Zarza refused to accept UM's settlement, UM commenced a retaliatory Disciplinary Review Conference ("DRC") which was **conducted by the same individuals Zarza submitted written discrimination/retaliation complaints against** to "justify" Zarza's termination while failing to disclose various conflicts of interest.

In its Order granting UM's Motion for Summary Judgment ("MSJ"), the

District Court analyzed the circumstantial evidence of discrimination under the burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and found that Zarza "met her *prima facie* burden as it pertained to her opposition of UM's failure to accommodate Taylor and her advocacy in support of him", and that UM "had a neutral, legitimate reason" for their adverse employment actions. [R. 54, PageID.1375-1376). The District Court, however, found that Plaintiff did not meet her burden to demonstrate that a reasonable jury could find by a preponderance of the evidence that the UM's stated reasons were pretextual. *Id.* In reaching the conclusion, the District Court erred by resolving factual disputes in the light most favorable to UM and ignored Zarza's evidence of pretext.

WHEREFORE, based on the foregoing, Zarza prays that this Court reverses the District Court's Order Granting UM's Motion for Summary Judgment and remand this matter for trial on the merits.

## STATEMENT OF FACTS

### I.     Background

Karen Zarza was hired by UM in 2003 and worked as a supervisor in UM's Custodial and Grounds Department from 2005 until her wrongful termination in November 2017. [Zarza transcript ("tr.") 130:24-131:1; 132:20-132:24, R. 48-6, PageID.1079-1081]. Throughout her 14 years of employment, Zarza had no documented history of discipline. [Owens' "Strategy" Email concerning Zarza's

Termination, R. 48-42, PageID.1307]. The most recent performance evaluations UM produced described her as a "very good and effective communicator" who is "calm in her demeanor." [Performance Evaluation, R. 48-7, PageID.1085]. Zarza was well respected by her fellow supervisors, who described her as "effective," and "competent." [Ken Sawicki ("Sawicki") tr. 27:21-28:1, R. 48-10, PageID.1121-1122].

On August 3, 2015, UM entered into a consent decree with the DOJ in an effort to resolve complaints that stemmed from allegations that UM's "policy that employees with disabilities must be qualified for a vacant position when reassignment is a necessary accommodation constitutes a pattern or practice of discrimination on the basis of disability[.]" [Consent Decree, R. 48-2, PageID.1006-1020]. The consent decree requires UM to reassign disabled employees to open positions if they were qualified for the position. [David Masson ("Masson") tr. 46:14-24, R. 48-3, PageID.1023].

A few weeks after entering into this consent decree, and on August 26, 2015, UM terminated Zarza's subordinate employee, Taylor. [Taylor's *pro se* Federal Complaint, R. 48-4, PageID.1029-1044].

On May 8, 2017, Taylor filed a *pro se* disability discrimination lawsuit against UM. *Id*.[2] Taylor alleged that he was placed on medical leave as a result of a work-related injury while working for UM as a Custodian, that he made numerous requests

---

[2] Taylor separately filed a workers' compensation claim against UM.

6

for accommodations based on his work restriction, but UM "refused to accommodate [Taylor] or offer any alternative placement within [Taylor's] restrictions," and that he was ultimately wrongfully terminated from employment based on his disability. *Id.*

As a supervisor, Zarza attended trainings and kept up with UM's policies and compliance obligations under the Americans with Disabilities Act ("ADA") and other anti-discrimination statutes. [Colette Donner ("Donner") tr. 71:4-8; 119:2-13, R.48-5, PageID.1049-1050]. Zarza believed, in good faith, that UM discriminated against Taylor, and advocated on behalf of her disabled subordinate employee.

## II.    Zarza Opposed UM's Illegal Discrimination Against Taylor.

### a.    May 11, 2017 Meeting with Lawter, Miller, and Sawicki evidences Lawter's retaliatory intent.

Two days after Taylor filed his federal lawsuit, and on May 10, 2017, Zarza requested to meet with UM's Facilities and Operations ("F & O") Director John Lawter ("Lawter") to discuss the circumstances surrounding Taylor's termination, and Zarza's support for his pending federal disability failure to accommodate lawsuit. [Zarza 5/10/17 Email, R. 48-11, PageID.1125]. On May 11, 2017, Zarza and fellow custodial supervisors Sawicki and Vershawn Miller ("Miller") met with Lawter. During this meeting, Zarza advocated on behalf of the disabled employee, advised Lawter of her good faith belief that UM failed to accommodate Taylor and discriminated against him based on his disability. [Lawter tr. 119:4-6, R. 48-12, PageID.1145]; [Zarza tr. 53:10-14, R.44-11, PageID.893]; Lawter meeting notes, R.

7

44-5, PageID.842]. Zarza also professed that she had been named a witness by Taylor and advised Lawter that she would not perjure herself for UM. [Zarza tr. 21:24-22:21, R.44-11, PageID.888-889]. Specifically, Zarza conveyed that she would testify truthfully in support of Taylor and against UM due to her good faith belief that UM had mishandled his accommodation, and also expressed concern that UM would retaliate against her "for her concerns and opposition to UM's handling of the custodian's disability and workers' compensation claims." [Zarza Email to Masson, R.48-14, PageID.1153]. Miller's recollection of this conversation is as follows:

> Q.    Okay.  What   else   was   discussed   at   this   meeting?
> A.    It was about Colette[3] **changing documentation, dates and things**. And I can't remember exactly how we got on the conversation about [Zarza]. It was something about [Taylor] and his court appearance or court dates or whatever. And [Zarza] was obviously someone that they had called on for [Taylor], and **she had made the statement that she wasn't going to lie for [Taylor], she wasn't going to lie for the [UM], nor was she going to lie for [Lawter], I'm not going to lie for anybody, I'm going to tell the truth as the truth is.**
> Q. And what was [Lawter's] response to that?
> A. **His face turned beet red**.

[Miller tr. 89:6-18, R.44-12, PageID.897] (emphasis added). In response, Lawter warned Zarza against "collusion" and told her UM "**will provide you with the**

---

[3] "Colette" is referring to Colette Donner, UM's Custodial and Grounds Service Department Area Manager. Here, Zarza provided a disability advocacy discrimination complaint based on her good faith belief that Donner was one of the individuals that did not accommodate Taylor's restrictions, and also did not accept medical documents from Taylor. [Lawter tr. 119:4-6, R. 48-12, PageID.1145]. **Donner was one of the individuals on Plaintiff's DRC who made the decision to terminate Plaintiff's employment in November 2017**. [R.48-44, PageID.1317].

information you will use[.]" [R. 48-14, PageID.1153] (emphasis added).

### b.    May 16, 2017 email evidences Brancheau and Owens' retaliatory intent.

Following Zarza's meeting with Lawter, on May 16, 2017, Custodial and Grounds Business Manager Kristen Brancheau ("Brancheau"), **who had been heavily involved in Taylor's accommodation requests,** emailed her mentor at Central Human Resources ("HR"), Sabrina Garrett Owens ("Owens"), to inform her of Zarza's meeting with Lawter, and states in relevant part:

> It is my understanding that [Zarza] might testify for Robert Taylor in his court case, basically stating that [Donner] was out to get him, **we** didn't accommodate his restrictions, etc. **So now I get to provide detail on all of this. You know what a nightmare case [Taylor's] was, ugh. When the evidence shows that [Zarza] is not accurate, can we finally discipline her <u>for this</u>?**

[5-16-17 Email, R.48-15, PageID.1158] (emphasis added). In response, Owens affirmed Brancheau's retaliatory animus in **disciplining Zarza for engaging in protected activity** and testifying in support of a disabled subordinate employee based on her good faith belief that UM "didn't accommodate his restrictions", and states:

> Wow! If the evidence clearly shows that [Zarza] is wrong, then I think John can do more than fire her.

*Id.* Brancheau and Owens never disclosed their conflict/biases to UM. [Leti Rastigue ("Rastigue") 30(b)(6) Vol. I tr. 82:10-84:9, R.48-16 PageID.1165-1167].

### c.    UM admittedly failed to investigate Zarza's disability advocacy

9

**discrimination complaints.**

UM failed to investigate Zarza's complaint of disability discrimination against Taylor. [R. 48-14, PageID.1152]; [Kristin Brancheau ("Brancheau") tr. 221:25-222:20, R. 48-18, PageID.1204-1205].[4] Despite the fact that UM failed to investigate same, on May 17, 2017, Lawter advised Zarza that her allegations were unfounded. [Lawter tr. 151:9-11, R.48-12, PageID.1146] ("no evidence to support her claims on [Donner]").

On June 22, 2017, UM sent Zarza and Brancheau a litigation hold letter asking them to preserve all documentation "related to the claims of Robert Taylor." [R. 48-20, PageID.1223-1225]. The letter identifies the relevant witnesses, including Zarza, and advised the recipients of the litigation hold to contact Masson if they had any questions regarding Taylor's Case. *Id.*

On June 28, 2017, Zarza met with Brancheau and Rastigue, F & O Associate Director of HR, to discuss her testimony in the Taylor lawsuit. [Rastigue 30(b)(6) Vol. I tr. 36:14-37:3, R.48-16, PageID.1161-1162]; [Brancheau's Notes, R. 48-21, PageID.1227]. During the meeting, Zarza discussed the Taylor lawsuit, and objected to the fact that Donner would not accept Taylor's medical documentation. *Id.* In response, Rastigue discouraged Zarza from testifying in support of Taylor and

---

[4] While Brancheau investigated a complaint against Donner for falsifying records, she did not investigate Zarza's complaints concerning Taylor.

advised her that she "**couldn't testify**" because the information was purportedly hearsay or "second hand knowledge." [Brancheau's Notes, R. 48-21, PageID.1227].

## III.    UM retaliates against Zarza and conducts a pretextual misconduct investigation.

While UM failed to investigate Zarza's disability advocacy discrimination complaints, and Brancheau failed to disclose her bias, Brancheau retaliated against Zarza and conducted a pretextual misconduct investigation.

Specifically, on approximately September 5, 2017, Scott Price ("Price"), Zarza's coworker and fellow supervisor, complained about Zarza **to Donner**. [Price tr. 106-113, R. 48-22, PageID.1230-1237].[5] As a result of Price's complaint to Donner, Brancheau interviewed witnesses and prepared a 12-page report concerning purportedly vague complaints about Zarza being a "mean" supervisor who bullies her subordinates; the same Zarza that was sticking her neck out and advocating on behalf of her former subordinate disabled employee. [Brancheau report, R.48-19].

To assist Brancheau's crusade, Donner corralled witnesses at Brancheau's behest, at least one of whom was surprised that he was going to be interviewed. [Terry Leach ("Leach") tr., 83:1-22, R. 48-23, PageID.1241]. UM admits that it only talked to the people brought to speak with Brancheau. [Brancheau tr. 218:11-15, R.48-18, PageID.1203].

---

[5] Zarza was out on a scheduled two-week vacation from 8/28/17 to 9/11/17. [MSJ, R. 44, PageID.758]; [complaint, R.1, PageID.7, ¶44-45].

Following the witness interviews, Brancheau drafted an investigative report detailing the alleged complaints against Zarza. Incredibly, the report includes direct evidence of UM's retaliatory animus, and **includes complaints regarding Zarza's support for Taylor**. [Owens tr. 119:4-11, R.48-8, PageID.1094]; [Brancheau report, R.48-19, PageID,1214-1215]. ("Karen has told [Price] about Robert Taylor suing [UM], hopes he wins as he was done wrong"; Leach interview: "Poor Robert Taylor, [UM] didn't treat him well and she hopes he wins his lawsuit against us").

As thoroughly outlined, *infra*, Brancheau's pretextual investigation was a sham and evidence layers of pretext. UM's relevant policies, documents, and witnesses confirms that UM's manufactured and subjective "complaints" were unsubstantiated and, furthermore, not capable of objective evaluation.

### a.   Brancheau's post-investigation instructions prohibited Zarza from addressing her sham investigative findings.

Prior to UM interviewing Zarza concerning Brancheau's sham investigative findings, Lawter placed Zarza on administrative leave on September 11, 2017. [Complaint, R.1, Page.ID.7 ¶ 46]; [MSJ, R. 44, PageID.760]; [Answer, R.16, PageID.207 ¶ 46]. On September 13, 2017, Brancheau shared her investigative notes with Rastigue, and directed her to not provide Zarza with specifics concerning the purported employee complaints when interviewing Zarza in an effort to stifle Zarza's rights to address same. [MSJ, R. 44, PageID.759]. On September 13, 2017, Rastigue interviewed Zarza concerning Brancheau's investigation. Rastigue failed to provide

Zarza with all of the pretextual allegations presented against her, and Zarza denied all of the baseless accusations provided. *Id.*

Finally, Rastigue interviewed **Donner** in connection with Zarza's investigation on September 15, 2017; the same individual Rastigue knew Zarza lodged a disability advocacy discrimination complaint against. [Brancheau's notes, R. 48-21, PageID.1227] (Zarza complaining Donner would not accept Taylor's medical documentation).

## IV. Zarza submits multiple written complaints that UM admittedly did not investigate.

On September 15, 2017, Zarza sent Laurita Thomas, HR, and Pamela Heatlie, Office for Institutional Equity, a formal written retaliation complaint. [R. 48-34, PageID.1289-1290]. There, Zarza outlines the fact that she met with Lawter, objection to Taylor's disability discrimination, advised Lawter of the "Pending Federal Lawsuit against the University a case that **I have been named as a witness**," and states:

> My meeting with (Lawter) ended with him telling me "I would like to remind you that you are still a University Employee, and caution you about collusion, and If you are called as a witness in [Taylor] Lawsuit **we will provide you the information you will use**." The meeting concluded with me feeling as If I had been kicked in the teeth. My concerns fell on deaf ears, and I immediately knew that my continued employment would be brief, [Miller] and [Sawicki] agreed. ... I am asking [UM] for help and protection . . . **I continue to be harassed, The current issue is I have been placed in the painfully awkward and unnecessary position of defending myself against allegations that have been allegedly brought forward by some staff members, Allegations that the department had previously investigated and determined were unfounded**. I have been placed on Administrative Leave and

**sincerely believe that I will be discharged or demoted**. I would like the opportunity to meet with you to discuss some of these concerns, and **I am asking that Your office conduct it's own investigation.**

*Id.* (emphasis added). On September 18, 2017, Zarza sent Masson and the DOJ attorney monitoring the consent decree a second written retaliation complaint that is virtually identical to the September 15th complaint, where Zarza expressly advised that her retaliation stems from the complaints due to, *inter alia*, the fact that she was "named as a witness." [R.48-14, PageID.1153-54] (emphasis added).

In Response, Masson emailed Owens and Tim Wood, UM HR, at 9:06 a.m. advising them that Zarza "directly obliquely allege[d] that she was threatened regarding potential testimony in the Robert Taylor Lawsuit." *Id.* at PageID.1152. Rastigue responded to Masson's inquiry at 9:23 a.m. by copying Brancheau and advised Masson that she looked into her notes from the June 28, 2017 meeting, and that she "**didn't have anything** in them regarding [Zarza's] concern about **not being called as a witness**" to Taylor's lawsuit. [R.48-36, PageID.1295-96] (emphasis added). In Response, and at 10:34 a.m., Brancheau falsely advised Masson that Zarza "expressed concerns to John Lawter **about _not_ being called as a witness** in Robert Taylor's case." *Id.* (emphasis added). Here, Rastigue and Brancheau provided Masson with contradictory information concerning the June 28, 2017 meeting. *Id.*

In reality, Zarza did not ever object to "not being called as a witness."[6]   UM knew Zarza **was named as a witness**, as demonstrated in:

1) Brancheau's May 16, 2017 email, which states: "It is my understanding that **(Zarza) might testify for Robert Taylor in his court case**, basically stating that Colette [Donner] was out to get him, we didn't accommodate his restrictions, etc." [R.48-15, PageID.1158].

2) Zarza's retaliation objection to Thomas and Heatlie, which was also sent to Masson, states: "I told [Lawter] that I was in fear of being terminated ... I asked him for his help and protection and briefly discussed the previously mentioned topics, part of that included **a Pending Federal Lawsuit against the University a case that I have been named as a witness.** [R. 48-14, PageID.1153-54].

3) UM sent Zarza a litigation hold letter concerning Taylor's lawsuit. [R.48-20, PageID.1223-25].

Thus, evidence exists and confirms the fact that UM's decision makers and HR personnel, which includes Masson, Thomas, Heatlie, Rastigue, Brancheau and Owens, understood that Zarza's complaint stemmed in part from being "named as a witness"; not expressing concerns about "not being called as a witness."

a.    <u>UM admittedly fails to investigate Zarza's Complaint</u>.

Thereafter, and at 10:52 a.m., Masson asked if "anyone is investigating her harassment claims?" [R. 48-14, PageID.1152]. UM admits that Zarza objected to the retaliation, harassment, hostile work environment she was made to endure both orally

---

[6] Brancheau's June 28, 2017 notes also did not include any information concerning this false allegation. [Brancheau's notes, R.48-21, PageID.1227].

and in writing. [Complaint, R. 1, PageID.8, ¶ 48]; [Answer, R. 16, PageID.207 ¶ 48]; [Rastigue/Owens email; R.48-39, PageID.1301]. UM also **admits that it did not investigate Zarza's discrimination and retaliation complaints**. [Brancheau tr. 221:25–224:19, R.48-18, PageID.1204-07]; [Owens tr. 158:18-24, R. 48-8, PageID.1102]; [Masson tr. 66:8-12, 94:6-15, R.48-3, PageID.1024; 1026]. In fact, Lawter admits that he was not even aware that Zarza submitted a retaliation complaint or requested an investigation concerning same. [Lawter tr. 111:25-114:17, R.48-12, PageID.1141-1144].

> **b.    UM attempts to cover up its failure to investigate Zarza's retaliation complaint**.

On September 18, 2017, at 4:00 p.m., Owens responds to Masson's inquiry as to whether anyone was investigating Zarza's complaint, and states:

> I just spoke with [Rastigue], and she explained that (Zarza) made all of these allegations **as a result of <u>not</u> being called as a witness** in the Robert Taylor case.[7] [Rastigue] indicated that she would not have been called as a witness because she was not at work during the time of the incident, therefore had no first-hand knowledge of the case. Additionally [Zarza] was unable to provide specifics to support her allegations. After [Rastigue] and [Brancheau] interviewed her, they dismissed her claims as having no merit.

[R. 48-14, PageID.1152]. The information Owens provided here is a knowingly false

---

[7] This testimony is in direct contradiction of Rastigue's 9:23 a.m. email advising Masson that she looked into her notes and "**didn't have anything** in them regarding (Zarza's) **concern** about **not being called as a witness**." [R.48-37, PageID.1295-96] (emphasis added).

premise to justify its failure to investigate. Owens knew that Zarza's complaint was **not** about "not being called as a witness." *See e.g.,* [R. 48-15, PageID.1158]. In fact, Owens admits in her deposition that Zarza's "claims was that she thought we were retaliating because she **was going to be a witness** for Robert Taylor, on his behalf." [Owens tr. 159:22-24, R.48-8, PageID.1103] (emphasis added). And while Owens claims that Zarza "was unable to provide specifics to support her allegations" in the September 18th correspondence, she admitted in her deposition that she does not actually know if Zarza's allegations were ever investigated; they were not. [Owens tr. 159-160, *Id.*, PageID.1103-04]. Furthermore, Owens claimed that Rastigue and Brancheau interviewed Zarza, and "dismissed her claims as having no merit." Brancheau, however, admits that she did not ever investigate Zarza's disability advocacy or retaliation complaints. [Brancheau tr. 221:19-222:20, R. 48-18, PageID.1204-1205]. Clearly, UM sought to justify its failure to investigate Zarza's retaliation complaint by misstating Zarza's complaint.

**V.     UM presented Zarza a settlement offer with a general release, but Zarza refused.**

On September 19, 2017, Owens emails Rastigue and Lawter to discuss what "**options might be the best approach to ending (Zarza's) employment**", and suggested making a settlement offer "that clearly states that if she does not accept it, we will convene a DRC seeking her discharge for unsatisfactory Work Performance/Inability to Lead the Workforce. . . Given her years of service and **lack**

**of documented discipline**, I believe a Settlement might be our best option." [R.48-42, PageID.1307] (emphasis added).

On September 21, 2017, Zarza was provided with a settlement agreement from UM, which contains a general release. *See id.*; [Settlement agreement, R. 48-46]. Rastigue indicates the following exchange took place when she provided Zarza with the settlement agreement:

> I explained [to Zarza] that the investigation I was conducting would result in a DRC. An alternative to that would be the signing the settlement agreement. ... **She asked about her** responsibilities and **rights** during this time **to have access to refute the charges against her**. I said that she would no longer have responsibilities and that **she should use this time to search for a job**.

[R.48-42, PageID.1309] (emphasis added). Clearly, Zarza's termination was a foregone conclusion. At that time, and prior to the pretextual DRC hearing, UM also asked for Zarza's keys, requested that her access be removed with the exception of emails, and "deactiv[ated] her UMID access." *Id.* But Zarza did nothing wrong, did not agree to voluntarily terminate her employment, and rejected UM's settlement.

**VI.    UM's sham DRC was conducted by individuals that Zarza submitted disability discrimination/retaliation complaints against.**

On November 10, 2017, UM held a DRC. [MSJ, R. 44, PageID.767]. The DRC committee was made up of Owens, Rastigue, and Donner. *Id.* As a threshold matter, this DRC committee violates UM's Conflict of Interest policy because:

> 1)    Donner is the individual that Zarza accused of refusing to accommodate Taylor or accept his medical documentation,

[Brancheau/Owens email, R. 48-15, PageID.1158];

2)      Zarza submitted a retaliation complaint based on the retaliatory misconduct investigation that was conducted by Rastigue and Brancheau, [R. 48-14, PageID.1153-54]; and

3)      Owens wanted Zarza fired once she became aware of the fact that she "might testify for Robert Taylor in his Court case", where Owens was involved in Taylor's termination and later attempted to cover up UM's failure to investigate Zarza's harassment complaint. *Id.* at PageID.1152; [R. 48-14, PageID.1152].

To make matters worse, the DRC committee also received input from Brancheau and Lawter concerning the disposition of Zarza's employment. [Brancheau tr. 99:5-7-100:10-25, R.48-18, PageID.1183-84]. Again, Zarza submitted a retaliation complaint against Lawter for threatening her after she initially presented her disability advocacy discrimination complaint and submitted a retaliation complaint against Brancheau for conducting the retaliatory and pretextual misconduct investigation against Zarza with Rastigue. [R. 48-14, PageID.1153-54]; [Brancheau/Rychlinski email, R. 48-43, PageID.1313] (Brancheau concedes that Zarza "thinks we are doing this because she is testifying for [Taylor]").

Prior to the commencement of the DRC, and on November 10, 2017, Kate Rychlinski, Assistant Director of Risk Management, forwarded an email to Brancheau concerning a subpoena she received for Zarza on behalf of Taylor. *Id.*, PageID.1313-15. Brancheau advised Rychlinski that Zarza was subject to a DRC **in one hour**. *Id.*, PageID.1313. In response, Rychlinski states:

> **If she's not our EE at the time of trial we can't be required to "produce" her <u>so that could actually be another benefit to</u>**

**terminating employment. Just saying...**

*Id.* (emphasis added).

The DRC began one hour after this email exchange. In connection with her DRC, Zarza previously asked Owens to interview Miller to help demonstrate that Price's allegations are false and indicated that Miller "was present for most of the conversation that I had with [Price] regarding the temp-to-hire employee Jose." [Rastigue DRC notes, R. 48-44, PageID.1317-18]. UM, however, failed to interview Miller. [Miller tr. 75:8-21, R. 48-9, PageID.1115]; [Owens/Brancheau email re Miller, R. 48-45, PageID.1320]. In her deposition, Miller admitted that she didn't hire Jose because she did not think he could speak English either, and also never witnessed Zarza admonishing Price. [Miller tr. 74:15-20, R.48-9, PageID.1114].

## VII.    UM retaliated against Zarza and terminated her employment.

On November 15, 2017, UM terminated Zarza's employment. [Termination letter, R.48-13, PageID.1150].[8] As discussed, *infra*, UM's purported reasons for termination are pretextual and meritless. In reality, UM retaliated against Zarza for advocating on behalf of a disabled employee and/or for submitting multiple

---

[8] While the contemporaneous documentation establishes the fact that UM intended on terminating Zarza's employment prior to the DRC, her termination letter falsely indicates that Zarza was "given the opportunity to respond or provide relevant evidence to refute the charge(s)" in the DRC. *See e.g.,* [Owens/ Brancheau email regarding Miller; R.48-44, PageID.1320].

complaints of retaliation.

## SUMMARY OF ARGUMENT

UM is not entitled to summary judgment on Zarza's retaliation claim under the Rehabilitation Act. At the summary judgment stage, Zarza only needs to show that there are disputed material facts regarding whether her termination was because of her complaints of disability discrimination and retaliation. Zarza has more than sufficiently done this by proffering a range of circumstantial evidence that creates a reasonable inference that her termination was retaliatory.

In particular, Zarza has shown—and the District Court correctly found—that there is a causal connection between her opposition to discrimination and the retaliatory investigation leveled against her. This circumstantial evidence is more than adequate to shift the burden to UM to prove that it had a legitimate reason to terminate Zarza in the absence of retaliation. While UM provided its purported legitimate non-retaliatory reason for termination, UM cannot prevail on this defense at summary judgment due to the disputed material facts that exist and significant evidence of pretext. The District Court erred by ignoring Zarza's substantial evidence of pretext. A reasonable juror could easily conclude that UM would not have terminated her in the absence of her opposition to discrimination or complaint of retaliation.

## STANDARD OF REVIEW

Dismissals based on summary judgment are reviewed *de novo*. *Trs. Of Resilient Floor Decorators Ins. Fund v. A & M Installations, Inc.*, 395 F.3d 244, 247-48 (6th Cir. 2005). In applying *de novo* review to an order granting summary judgment, the Sixth Court "us[es] the same standard applied by the district court" under Rule 56 of the Federal Rules of Civil Procedure. *Petty v. Metro. Gov't of Nashville-Davidson Cty.*, 538 F.3d 431, 438 (6th Cir. 2008).

Under Rule 56, summary judgment may only be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as matter of law." Fed.R.Civ.P. 56(c).

In applying this standard, "[c]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable' to the party opposing the [summary judgment] motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir.1994). Courts "must also be mindful not to weigh the evidence or make credibility determinations." *Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016) (citing *Adams*, 31 F.3d at 378). For example, the parties or the Court may draw "different conclusions from [] deposition testimony," but at the summary judgment stage the non-movant's view of such testimony must be followed. *Craig v. Bridges Bros. Trucking, LLC*, 823 F.3d 382, 390 (6th Cir. 2016).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248(1986). So, a claim should go to trial if "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

"[I]n discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain … thereby frequently making such factual determinations unsuitable for disposition at" MSJ. *Singfield v. Akron Metro. Hous. Auth*, 389 F.3d 555, 564 (6th Cir. 2004) citing *USPS Bd. of Governors v. Aikens,* 460 U.S. 711, 716 (1983) (acknowledging that discrimination cases present difficult issues for the trier of fact, as "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes").

## I.   The District Court erred because it *sua sponte* Dismissed Zarza's lawsuit for failure to provide sufficient evidence of pretext even though UM never argued that Zarza failed to provide sufficient evidence of pretext.

UM's adverse employment actions against Zarza was a direct result of her advocacy for Taylor and, therefore, constitutes illegal retaliation in violation of the Rehabilitation Act.

UM moved for summary judgment based on two arguments: Section A of UM's MSJ argues: "Plaintiff Has Not Established a Prima Facie Case of Retaliation Under Section 504 of the Rehabilitation Act." [MSJ, R. 44, PageID.770-777].

23

Section B of UM's MSJ Argues: "Defendant Has Articulated a Legitimate, Non-Retaliatory Reason for Plaintiff's Termination." *Id.* at PageID.777-778. **UM never moved for summary judgment based on Zarza's failure to provide evidence of pretext**. UM made this strategic decision based on their perceived strengths/weaknesses in their defense. To that end, UM literally mentioned the word "pretext" once in their MSJ brief in their general description of the *McDonnell Douglass* burden-shifting paradigm, and never once argued that Zarza failed to provide evidence of pretext. [MSJ, R.44, generally].

Zarza thoroughly addressed the argument UM made and, in turn, the District Court found that Zarza "has met her *prima facie* burden as it pertains to her opposition to Defendant's failure to properly accommodate Taylor and her advocacy in support of him", and that UM provided "a neutral, legitimate reason to place [Zarza] on administrative leave and terminate her." *Id.*, PageID.1375-1376. The District Court's analysis should have ended there with a denial of UM's MSJ. The District Court, however, *sua sponte* addressed the third prong of the McDonnell Douglass burden shifting paradigm and Granted UM's MSJ solely because it found that Zarza "has not produced sufficient evidence to show that there is a genuine issue for trial as it relates to pretext"; an argument UM never made. *Id.*, PageID.1383.

Aside from the fact that UM never presented this argument in its MSJ, a hearing was not conducted for UM's MSJ to enable Zarza to address the avalanche

of pretextual evidence provided on the record. Specifically, Honorable Judge Tarnow presided over this lawsuit throughout the course of litigation and passed away on January 21, 2022. On February 16, 2022, this matter was reassigned to the Honorable Judge Cleland. On March 23, 2022, the District Court entered a Notice of Hearing. [R. 52]. On June 1, 2022, however, the District Court entered a Text Order Notice of Hearing Cancelled and Granted UM's MSJ and entered final judgment without a hearing on August 2, 2022. [R. 54, 55].

A *sua sponte* entry of judgment based on arguments that a defendant did not move for summary judgment on are "disfavored" but not *per se* prohibited. *Turcar, LLC v. I.R.S.,* 451 F. App'x 509, 513 (6th Cir. 2011). Rather, "a district court may do so 'in certain limited circumstances,' provided the losing party is afforded 'notice and [a] reasonable opportunity to respond to all the issues to be considered by the court.'" *Id.* (citing *Shelby Cnty. Health Care Corp.,* 203 F.3d 926, 931 (6th Cir. 2000)) (quoting *Employers Ins. of Wausau v. Petroleum Specialties, Inc.,* 69 F.3d 98, 105 (6th Cir.1995); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 326, (1986); *Miller v. WFLI Radio, Inc*., 687 F.2d 136 (6th Cir. 1982). The District Court erred in throwing this life preserver to the drowning UM employer without affording Zarza with notice and a reasonable opportunity to address any additional issues to be considered by the Court.

## II. <u>Zarza provided sufficient evidence of pretext.</u>

Aside from the fact that the District Court erred in Granting UM's MSJ based on an arguments UM never made and without providing Zarza with an opportunity to address, the District Court erred because Zarza's Response produced ample evidence of pretext, and easily met her burden of showing that "the question of pretext is a genuine factual dispute", either way. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 661 (6th Cir. 2020) (citing *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011).

An employee can demonstrate pretext through inferences that the proffered reason either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. *Vincent v. Brewer Co.*, 514 F.3d 489, 497 (6th Cir. 2007). Courts should "exercise caution in granting summary judgment for the defendant once the plaintiff has made a *prima facie* case and a showing of pretext because 'an employer's true motivations are particularly difficult to ascertain, thereby frequently making such factual determinations unsuitable for disposition at" summary judgment. *Moffat v. Wal-Mart Stores, Inc.,* 624 Fed.Appx. 341, 348 (6th Cir. 2015) (citation omitted). Indeed, "[e]mployers of a mind to act contrary to law seldom note such a motive in their employee's personnel dossier." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1112 (2d Cir. 1988).

Here, UM's purported legitimate non-discriminatory reason for terminated

Zarza's employment is "[u]unsatisfactory work performance, specifically creating a hostile work environment of fear, intimidation, and harassment of [her] staff and colleagues." [termination, letter, R. 44-22, PageID.952]. This pretextual conclusion is based on Brancheau's sham investigation, which resulted in four "Findings". [Investigative Report, R. 48-19, PageID.1221]. The termination notice confirms that Zarza denied all the allegations made in the sham DRC investigation. *Id.* Nonetheless, UM terminated Zarza's employment based on those four reasons: 1) Scott Price's complaints; 2) "complaint by multiple custodians"; 3) incident with Jose; and 4) the confidentiality breach regarding the Stiltners. [Rastigue 30(b)(6) Vol. I tr. 106:16-22, R. 48-16, PageID.1168]. UM's four reasons/findings for termination are pretextual and meritless. In reality, UM retaliated against Zarza for advocating on behalf of a disabled employee and/or for submitting multiple retaliation complaints. Zarza has submitted sufficient evidence that "a reasonable jury could find by a preponderance of the evidence that the defendant's stated reasons are pretextual." *Gribcheck v. Runyon,* 245 F.3d 547 (6th Cir.2001).

      **a.**    <u>**No basis in fact**</u>.

A jury can infer retaliation "from the falsity of the employer's explanation." *Reeves v. Sanders Plumbing Products, Inc.*, 530 U.S. 133 (2000). Zarza proffered sufficient evidence to enable a reasonable jury to find by a preponderance of the evidence that UM's stated reasons have no basis in fact. [MSJ Opposition, R. 48].

And while Zarza provided sufficient evidence to show there is no basis in fact in any of UM's "Findings", **it is not necessary for Zarza to "show that <u>all</u> of the factors articulated by [UM] are false, but rather, only that <u>some</u> of the factors are false, and a mere pretext for discrimination"**. *Asmo v. Keane, Inc.*, 471 F.3d 588, 596 (6th Cir. 2000) (emphasis added).

### i.    <u>Zarza did not bully Scott Price</u>

One of Brancheau's four "Findings" states:

> "She has harassed and bullied Scott Price to the point he is ready to move to a different area. Scott has provided numerous examples where she goes over the line professionally in her interactions with him since he does not report to her."

[Investigative Report, R.48-19, PageID.1221].[9] While Brancheau concludes that Zarza "bullied" Price, the "numerous examples" identified in the report do not support her pretextual conclusion, or remotely suggest that Zarza "harassed and Bullied" Price.

First, Price accused Zarza of keeping a coffee mug with the phrase "little bastards" written in the inside rim of the mug in the breakroom. [R. 48-19, PaeID.1213]. Zarza, however, denies that this cup belonged to her. [Zarza's Interview, R. 48-25, PageID.1249]. Indeed, all staff members were allowed to keep

---

[9] Incredibly, Brancheau assigned Price—the main individual complaining about Zarza—to go "out and like gather() people" for her to interview for Zarza's investigation. [Brancheau tr. 88:21-89:25, R. 48-18, PageID.1181-1182].

mugs in the break room, and there is no evidence to suggest that this mug belongs to Zarza. [Donner tr. 41:13-17, R. 48-5, PageID.1047]. Brancheau did not seek to confirm Price's claim that the "little bastards" mug actually belonged to Zarza. [Brancheau tr. 135:6-24, R. 48-18, PageID.1192]. Thus, there is no basis in fact to support this accusation, which is not an example of "bullying Price", either way.

Second, Price accused Zarza of sabotaging him by taking his keys and hiding a piece of cleaning equipment known as the hall scrubber. [R. 48-19, PaeID.1214]; [Donner tr. 148:3-149:3; R. 48-5, PageID.1051-1052]. There is no evidence, however, to support Price's accusation that Zarza took his keys or hid the hall scrubber. [Donner tr. 155:10-14; 156:10-12, R. 48-5, PageID.1058-1059]. To the extent Price actually lost his keys, he was required to contemporaneously notify Donner, and complete an incident report with UM's Department of Public Safety and Security. [Lawter tr. 74:2-25 R.48-12, PageID.1130]; [UM's Key Policies, R. 48-26, PageID.1251-1254]. UM, however, failed to provide any evidence that Price followed UM's "lost key policies." Additionally, Zarza was never provided an opportunity to address this accusation in her interview, which—on its own—is evidence of pretext. [Zarza Interview, R. 48-25]. *See DeFreitas v. Horizon Inv. Mgmt. Corp.*, 577 F.3d 1151, 1161 (10th Cir. 2009) ("[I]t might well strike the jury as passing strange that [decisionmaker] would fire [Zarza] based on comments by subordinates without first asking her for her version of events[.]") There is no basis

in fact that Zarza took Price's keys or hid the cleaning equipment.

Third, Price also complained that Zarza violated UM's nepotism policy by showing favoritism to her son's alleged girlfriend and UM custodian, Kylah. [R. 48-19, PageID.1213]. As a threshold matter, Kylah was not Zarza's son's girlfriend, and Brancheau admittedly failed to make any attempt to contact Kylah to confirm Price's allegations. [Brancheau tr. 128:1-129:9; 186:18-187:18, R. 48-18, PageID.1188-1189, 1197-1198]; [R. 48-44, PageID.1318]. Assuming, *arguendo*, that Kylah was Zarza's son's girlfriend, this relationship would not be covered by UM's nepotism policy, either way. [UM Nepotism Policy, R. 48-28, PageID.1262-1265]. Aside from the fact that this baseless accusation does not remotely support a finding that Zarza "harassed and bullied" Price, this accusation has no basis in fact.

Fourth, the District Court reached its opinion based on Brancheau's report's claim that Price also accused Zarza of not hiring a temporary worker named Jose because he was Hispanic. [R. 54, PageID.1377]; [R. 48-19, PageID.1212-1213]. It appears Price was not aware that Zarza was also of Hispanic descent. Miller testified, there is not a racist bone in Zarza' body, and that she never saw her treat people differently because of her race. [Miller tr. 36-38, 38:10-15, R.48-9, PageID.1109-1111]. In reality, Zarza advised in her investigative interview that Jose "couldn't speak English hardly at all", and she therefore could not hire him because she could not communicate with him. [R. 48-29, PageID.1267]. Indeed, Donner admits that

Zarza advised her of her good faith belief that Jose's English proficiency could have been a safety concern. [Donner tr. 193:16-24, R. 48-5, PageID.1068]. Donner further explains:

> "[Zarza] had a chance to hire for one of her open positions in her shop she interviewed him and felt like his … lack of English was a huge barrier, and she – I remember she'd asked me to sit in and she said I can't understand him. **And I said I get it, you're supposed to be able to read and write English to work here. If you can't work with him, you can't understand him, I understand that.** There's other candidates that you could interview if it's going to be a barrier for you…"

*Id.* 186:19-3, PageID.1061-1062 (emphasis added). Thus, UM knew there is no basis in fact that Zarza refused to hire Jose because he was Hispanic.

Fifth, after Price baselessly accused Zarza of having a "problem with people of other cultures," Price claimed Zarza favored Arab-American employee Iyad Joma because he was purportedly allowed to leave early on certain days. [Brancheau report, R.48-19, PageID.1213]. In reality, Joma is Muslim, and Zarza complied with Joma's request for religious accommodations to leave early for Friday prayers in accordance with UM's policy. [R. 48-44, PageID.1318]. Brancheau never interviewed Joma to obtain the full story, which was inconsistent with the UM's investigation procedures and—on its own—evidence of pretext. [Rastigue 30(b)(6) Vol 1 tr. 133-134; R. 48-16, PageID.1169-1170]; [UM Procedural Guidelines for Handling Discrimination and Harassment Complaints, R.48-30, PageID.1269-73]; [Owens tr. 122:6-17, R.48-8, PageID.1096]; *See Hurlbert v. St. Mary's Health Care*

*System, Inc.,* 439 F.3d 1286, 1299 (11th Cir. 2006). (An employer's "deviation from its own standard procedures may serve as evidence of pretext.") Again, there is no basis in fact in Price's allegations and, moreover, granting a subordinate employees' request for a religious accommodation is not an example of "favoritism", either way.

Sixth, Zarza was accused of mishandling a sexual harassment investigation against D.S. because D.S. only received a write-up. [R. 48-19, PageID.1215-1216]. Zarza, however, did not select the corrective action for this investigation; Brancheau did. [R. 48-44, PageID.1318]. Again, there is no basis in fact in Price's allegation.

Seventh, the District Court referenced Brancheau's report's claim that Zarza "berated and yelled at [Price] for two hours after he was off the clock." [Order, R. 54, PageID.1377]. Rastigue, however, failed to ask Zarza about this incident to provide her with an opportunity to address these allegations, which is evidence of pretext. [R. 48-25, PageID.1247-1249]. Furthermore, Zarza denied Rastigue's general question about being a yeller. [R. 48-25, PageID.1247] ("Q: Do you ever address any of your employees in a loud or yelling manner? [A:] No, never, I'm' not a yeller."). Again, there is no basis in fact in Price's allegation.

### ii.    Zarza did not bully the temporary staff.

Brancheau's third finding states:

> Karen has bullied and berated the temporary staff to the point they either quit or she fires them because they don't meet her standards.

[R. 48-19, PageID.1221].

First, the report claims that Zarza fired a temporary employee named Tania "in front of everyone" in a confrontational situation. *Id.* at PageID.1211.[10] Brancheau, however, could not identify anyone that Tania was terminated "in front of", and admittedly did not know where the termination took place. [Brancheau tr. 214:21-215:22, R. 48-18, PageID.1201-1202]. Zarza also denied this allegation in her investigation interview. [Rastigue notes, R. 48-25, PageID.1247] ("Q: Karen, have you ever addressed performance issues of one of your employees in front of others? A: No ..."). Thus, there is no basis in fact here.

Second, the District Court references Brancheau's report's claim that Zarza treats the temps poorly and "works them to death." [Order, R. 54, PageID.1377]; [R. 48-19, PageID.1213]. Brancheau, however, admitted that Price advised her that Zarza allowed the temps to take their 30-minute breaks, and that she never asked any of the temps about their breaks to see if they were being "worked to death." [Brancheau tr. 130–131, R. 48-18, PageID.1190-1191]. Otherwise, requiring subordinate employees to work diligently is not a UM policy violation and an absurd predicate to justify a supervisor's termination. Again, there is no basis in fact here.

Third, the District Court reached its Opinion based on Brancheau's report's references concerning Zarza's treatment of a temp named Fanta. [R. 54,

---

[10] The District Court gave weight to Brancheau's report alleging that Zarza "makes situations worse than they have to be by accusing them of things", which was predicated on this allegation. [R. 54, PageID.1379].

PageID.1378]. Specifically, Fanta purportedly advised Brancheau one day before her termination that Zarza "call[ed] her honey and [made] her cry with her nasty demeanor" and complained that Zarza was "mean" because Zarza "told her if she didn't have her ID she couldn't work." [R. 48-19, PageID.1210, 1216]. Zarza, however, denies that she treated any employee in a poor fashion. [R. 48-25, PageID.1247]. In her deposition, Brancheau admitted that Fanta was terminated **the day after her statement against Zarza** was provided, Fanta did not elaborate on how Zarza was "mean" to her, Brancheau did not review Fanta's evaluation, and admitted that temp employees need to bring their IDs to work. [Brancheau tr. 172:2-173:21, R.48-18, PageID.1195-1196]. Owens also admitted that custodians cannot be on their cell phones for safety reasons. [Owens tr. 130:2-131:21, R. 48-8, PageID.1199-1200]. UM has also failed to provide any comparator evidence of terminating supervisors for requesting temporary employees to bring their IDs and not use cell phones for safety reasons. Again, there is no basis in fact here.

Finally, Brancheau's investigation claims that when Robert English started working for UM as a temp, Zarza yelled at him for having moldy Tupperware in a closet. [R. 48-19, PageID.1219]. Again, Zarza denied that she yelled at any employee. [R. 48-25, PageID.1247] ("Q: Do you ever address any of your employees in a loud or yelling manner? [A:] No, never, I'm' not a yeller."). Moreover, the Tupperware incident happened when English was a temp employee, **years prior** to

this investigation. [Brancheau tr. 207:9-20, R. 48-18, PageID.1200]. Finally, Zarza denies that she ever "bullied" the temporary staff or treated them differently. [R. 48-25, PageID.1247]. There is no basis in fact here.

### iii.    Zarza did not violate confidentiality guidelines.

One of Brancheau's four findings claims that Zarza "violated confidentiality guidelines numerous times." [R.48-19, PageID.1221]. While the finding claims "numerous" violations, the report only includes one alleged violation. *Id.* at PageID.1210-1211. Specifically, Price claimed that Zarza breached confidentiality by speaking with a custodian's father—who was also an employee—about his son's incarceration. First, Brancheau could not identify a "confidentiality policy" applicable to this situation, because none exist.  [Brancheau tr. 111-113:8, R. 48-18, PageID.1185-1187].  Second, Zarza advised UM in her investigative interview that she didn't share the incarceration information with the father, but the father advised her of same. [R. 48-25, PaeID.1247]. Third, Price later admitted that while he saw Zarza speak to the custodian's father the day of the incident, he did not actually hear the conversation, and does not know what they were talking about. [Price Vol. II tr. 190:17-192:10,  R.  48-31,  PageID.1276-1278].  Finally,  Brancheau  failed  to interview the father. [Brancheau tr. 218:11-15, R. 48-18, PageID.1203]. Thus, there is no basis in fact to support this allegation.

### iv.    Zarza did not bully her staff.

One of Brancheau's four "Findings" claims that Zarza bullied and berated people. [R. 48-19, PageID.1221]. In reaching its Opinion, the District Court referenced Brancheau's report's claim that Zarza referred to her subordinates as "bastards." [Order, R. 54, PageID.1377]; [R. 48-19, PageID.1212]. Zarza, however, denied that she ever referred to her subordinates as "bastards" or "little bastards". [R. 48-25, PageID.1248-1249]. Miller also admitted that she has never heard Zarza call her subordinates little bastard. [Miller tr. 39:15-17, R. 48-9, PageID.1112.] Thus, Zarza has provided sufficient evidence for purposes of MSJ to show there is no basis in fact that she referred to her subordinate employees as "bastards."

The District Court also referenced Brancheau's report, stating "[w]hen Karen is gone, everyone is good but when she is at work the environment changes and everyone is on edge." [R. 54, PageID.1378]; [R. 48-19, PageID.1216]. Rastigue, however, never asked Zarza about keeping subordinates "on edge", and Zarza generally denied mistreating her subordinates. [R. 48-25, PageID.1248-1249]. Additionally, in judging whether a subjective reason is legitimate, it must be "capable of objective evaluation[.]" *Corner v. Fort Gordon Bus Co.,* 761 F.2d 1495, 1500 (11th Cir. 1985); *see also Kimble v. Wasylshyn*, 439 F.App'x 492, 497 (6th Cir. 2011) (citation omitted) (legitimate nondiscriminatory reason "subject to particularly close scrutiny where the evaluation is subjective"). This is critical because subjective reasons by their very nature, often serve to mask discrimination.

36

*See Roberts v. Gadsden Memorial Hospital*, 835 F.2d 793, 798 (11th Cir 1988), *opinion amended on reh'g*), 850 F.2d 1549 (11th Cir. 1988). This allegation is not capable of objective evaluation and is, therefore, an insufficient basis for UM to rely on for Zarza's termination.

      The District Court also gave weight to Brancheau's report stating that Zarza allegedly looked for the worst in people and was negative. [R. 54, PageID.1378 citing R. 48-19, PageID.1219]. Brancheau's report, however, failed to provide any specific examples of how Zarza was allegedly negative, and this allegation is, therefore, not capable of objective evaluation.

      The District Court gave weight to Brancheau's report alleging that Webb purportedly referred to Zarza as "loopy", "harassing", and "not fit to work here." [R. 54, PageID.1378]. These characterizations are apparently predicated on 1) Zarza asking Webb "how to use a piece of equipment which was odd as they know how to use it"; 2) Zarza advised him that his shoes were not safe when he was going through her building to empty trash; and 3) Zarza "stopped him as he was using the hall scrubber and asked if he was going to clean it." [48-19, PageID.1220]. Again, this purported complaint is not evidence of harassment and incapable of objective evaluation.

      The District Court gave weight to the allegation that Zarza purportedly did not like A.J. Canada, though he "doesn't know why [Zarza] doesn't like him, if it is

because she didn't hire him or because he is black." [R. 54, PageID1379 citing R. 48-19, PageID.1220-21]. Brancheau, however, admitted that she never investigated Canada's allegations beyond writing them down, and Zarza's was not asked about this purported allegation:

> Q. So if you didn't interview a bunch of people or look at records or get [Zarza's] side of the story, how are you coming up with a conclusion?
> A. I came up with the conclusions of what they said in these interviews. **It wasn't whether or not [Zarza] was guilty or not guilty.** It was a summary of what I – what the findings were of what they all said to me.

[Brancheau tr. 218:11-17, R. 48-18, PageID.1203] (emphasis added). There is no basis in fact to support this allegation. Additionally, UM failed to ask Zarza for her side of the story which, on its own, is evidence of pretext.

### b.    UM's proffered reason is not the actual reason.

The record is also replete with evidence to demonstrate the fact that UM's proffered excuse for terminating Zarza is not the actual reason.

### i.    The temporal proximity evidence pretext.

While temporal proximity between Zarza's protected conduct and the adverse actions against her "cannot alone prove pretext, temporal proximity can be used as 'indirect evidence' to support an employee's claim of pretext." *Asmo*, 471 F.3d at 598 (citations omitted); *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) (holding that a causal connection was established where employee was terminated within six months of protected conduct). When viewed in the light

most favorable to Zarza, the temporal proximity between 1) Zarza's engagement in protected activity from her 5/11/17 meeting with Lawter and 6/28/17 meeting with Brancheau and Rastigue to 2) UM's 9/11/17 retaliatory/pretextual misconduct investigation that led to 3) Zarza's 11/10/17 DRC and 4) 11/15/17 termination is evidence of pretext.[11]

### ii.    UM's language evidences that its proffered reason is not the actual reason for termination.

"Language not amounting to direct evidence, but showing some [discriminatory] animus, may be significant evidence of pretext[.]" *Jones v. Bessemer Carraway Med. Ctr.,* 151 F.3d 1321, 1323 (11th Cir. 1998). Here, the record is rich in language that evidences UM's retaliatory animus and is significant evidence of pretext. First, Rychlinski's email to Brancheau **within one hour of** Zarza's DRC advising "**If she's not our EE at the time of trial we can't be required to 'produce' her <u>so that could actually be another benefit to terminating employment. Just saying...</u>**" is significant evidence of pretext. [Brancheau/Rychlinski email, R. 48-43, PageID.1313] (emphasis added). Second, Brancheau's email exchange with Owens concerning her frustration about Zarza's advocacy and asking Owens if they can "finally discipline her **for <u>this</u>**"—**referring to her advocacy**—is

---

[11] Moreover, UM's retaliatory animus was readily on display from Lawter's comments during the 5/11/17 meeting, as well as Brancheau's comments in her 5/16/17 email. *See supra.*

significant evidence of pretext. [R.48-15, PageID.1158] (emphasis added). Third, Lawter's response to Zarza advocating on behalf of her disabled subordinate employee—where Lawter turned beet red, warned Zarza against "collusion", and advising her that UM "**will provide you with the information you will use**."—is also significant evidence of pretext. *See supra*, pp. 8-9.

### iii.    UM's failure to investigate Zarza's harassment/retaliation complaints is evidence of pretext.

An employer's failure to investigate complaints of discrimination/retaliation is evidence of pretext. *Watford v. Jefferson County Public Schools*, 870 F.3d 448 (6th Cir. 2017); *Zisumbo v. Ogden Regional Medical Center*, 801 F.3d 1185, 1201 (10th Cir. 2015). UM failed to investigate Zarza's numerous complaints of discrimination/retaliation. *See supra*.

The District Court rejected Zarza's argument that Brancheau failed to investigate Zarza's harassment complaints, finding that "the record plainly contradicts any notion that Brancheau was assigned to do so." [R. 54, PageID.1382]. Masson's September 18, 2017 email, however, asks:

 "Is anyone **investigating her** harassment **claims?** I understand that [Rastigue] is investigating the claims against Zarza but **who is investigating the issues alleged by Zarza?"**

R. 48-14, PageID.1152 (emphasis added).  In response, Ownes advises:

"I just spoke with [Rastigue], and she explained that [Zarza] made all of these allegations as a result of not being called as a witness in the Robert Taylor case … Additionally, [Zarza] was unable to provide

specifics to support her allegations. After [**Rastigue] and [Brancheau]
interviewed her, they dismissed her claims as having no merit**.”

*Id.* (emphasis added). Thus, the record clearly suggests that Brancheau **purportedly**

investigated Zarza's underlying harassment complaint.[12] In her deposition, however,

Brancheau admitted that she **never investigated Zarza's complaints concerning**

**Taylor**:

> Q. Were you only involved in the investigation that you did with the
> twelve pages of notes that we just went through? Is that the only time you
> investigated anything regarding Karen Zarza in 2017?
> A. Yes.

[Kristin Brancheau ("Brancheau") tr. 221:19-222:20, R. 48-18, PageID.1204-1205];

*See also* [Rastigue 30(b)(6) Vol I. tr. 37:14-24, R. 48-16, PageID.1162].

Additionally, UM failed to investigate Zarza's retaliation complaints, which

is evidence of pretext. *See supra*, pp. 13-17.

### iv.    UM's investigation concerning the complaints brought against Zarza is evidence of pretext.

An employer's failure to adequately investigate complaints of misconduct that

it relies on for its adverse employment actions is evidence of pretext. *See Duchon v.*

---

[12]    Moreover, Rastigue and Brancheau advised Masson of this purported
"investigation", and falsely claimed that Zarza "expressed concerns to John Lawter
**about not being called as a witness** in Robert Taylor's case." [R. 48-36,
PageID.1295]. In reality, Zarza's complaint to Lawter was concerning the fact that she
declared her intent to testify as a witness and advised Lawter that she would not
perjure herself for UM. [Zarza tr. 21:24-22:25, R.44-11, PageID.888-889]. This false
narrative—on its own—is further evidence of pretext.

*Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Tisdale v. Federal Exp. Corp.*, 415 F.3d 516, 529-30 (6th Cir. 2005). Here, Brancheau's investigation was a sham and evidence of pretext.

First, Brancheau admittedly did not investigate the veracity of the allegations made against Zarza by interviewing key witnesses, did not review relevant documents, or review relevant policies. [Brancheau tr. 218:11-15, R.48-18, PageID.1203] ("I came up with the conclusions of what they said in these interviews. It wasn't whether or not [Zarza] was guilty or not guilty. It was a summary of what I – what the findings were of what they all said to me."). Brancheau, for example, refused to interview Miller, Joma, Kylah, or Stiltner.

The District Court found that Brancheau's initial investigation into Zarza was not a sham or pretextual because "the record is wanting of any evidence as to Brancheau's role in Taylor's firing" and that her "use of the word 'we' —given the absence of any additional evidence to show Brancheau's personal involvement—is likely a general reference to the Custodial and Grounds Department as a whole." [R. 54, PageID.1381-1382]. The District Court is mistaken; Brancheau was intimately involved in Taylor's termination, was on Taylor's DRC that made the decision to terminate his employment, and the decisionmaker who made the decision to terminate his employment with Owens at UM's Central HR Department, as reflected on the record. First, Rastigue's email to Masson expressly advises that Brancheau had

"**firsthand knowledge of the detail behind Mr. Taylor's termination**."  R. 48-36,

PageID.1295 (emphasis added). Second, Brancheau's email with the "use of the word

'we'" referenced by the District Court states, in relevant part:

> It is my understanding that [Zarza] might testify for Robert Taylor in his
> court case, basically stating that [Donner] was out to get him, **we** didn't
> accommodate his restrictions, etc. ...
>
> **So now I get to provide detail on all of this, you know what a
> nightmare case (Taylor's) was, ugh.**
>
> When the evidence shows that [Zarza] is not accurate, can **we** finally
> discipline her for this?

R. 48-15, PageID.1158 (emphasis added).  Of course, Brancheau would not be in a

position to "provide detail" on Taylor's matter if Brancheau was not personally

involved. Third, Brancheau advised Masson that Taylor's "discharge was made in

agreement with Work Connections and HR, not made in a vacuum by our department."

48-36, PageID.1295. Fourth, Owens testified as follows in Taylor's lawsuit:

> Q. Do you know who made the decision to issue the Notice of
> Discharge on August 21st, 2015?
> A. Kristin Brancheau in consultation with our office, with me.
> Q. Who made the decision to make it effective August 25th of 2015?
> A. Kristin Brancheau.

Owens Tr. 39:8-14 at *Taylor v. Univ. of Michigan*, No.2:17-cv-11473, (E.D.Mich.

Aug. 8, 2019), [R.51-2, PageID.1098].[13]

---

[13] UM incorporated Taylor's federal court lawsuit by reference in their MSJ. *See* [R.
44, PageID.774].

Brancheau should have never been involved in conducting Zarza's pretextual investigation based on her conflict. UM's Conflict of Interest Policy, SPG 201.65, requires disclosure of any potential conflicts so that the conflict could be evaluated and eliminated. *Id.*; [R. 48-17, PageID.1173-1178].[14] UM's corporate representative, however, admits that Brancheau and Owens failed to disclose their biases to UM. [Rastigue 30(b)(6) Vol. I tr. 82:10-84:9, R.48-16 PageID.1165-1167]. This deviation from UM's policy is also evidence of pretext. *See Hurlbert v. St. Mary's Health Care System, Inc.,* 439 F.3d 1286, 1299 (11th Cir. 2006) ( An employer's "deviation from its own standard procedures may serve as evidence of pretext.").

### v.    UM's DRC is evidence of pretext.

UM's DRC provides layers of pretext. UM's 11/10/17 DRC committee was made up of Owens, Rastigue, and Donner. [MSJ, R. 44, PageID.767]. As a threshold matter, this DRC committee violates UM's Conflict of Interest policy because: 1) Donner is the individual that Zarza accused of refusing to accommodate Taylor or accept his medical documentation, [Brancheau/Owens email, R. 48-15, PageID.1158]; 2) Zarza submitted a retaliation complaint based on the retaliatory misconduct investigation that was conducted by Rastigue and Brancheau, [R. 48-14, PageID.1153-

---

[14] SPG 201.65-1 Conflicts of Interest and Conflicts of Commitment – All actual and potential conflicts of interest or commitment must be disclosed to a designated UM official; evaluated; and, if found to be significant, eliminated or managed. *Id.*, PageID.1173.

54]; and 3) Owens wanted Zarza fired once she became aware of the fact that she "might testify for Robert Taylor in his Court case", where Owens was involved in Taylor's termination and later attempted to cover up UM's failure to investigate Zarza's retaliation complaint. [*Id.*, PageID.1152]; [R. 48-14, PageID.1152]. *See Village of Arlington Heights v. Met. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role[.]") The composition of this sham DRC—on its own—is evidence of pretext and creates a disputed issue of material fact as to whether a neutral DRC would have elected to terminate Zarza under these circumstances.

UM's DRC was a sham and akin to the fox guarding the henhouse. Donner, Rastigue and Owens did not give Zarza a fair opportunity to defend herself because her termination was a foregone conclusion. First, the DRC kept the allegations against Zarza vague so that she had to guess at the questions' meaning or just summarily deny the allegations. [DRC notes, R.48-44, PageID. 1317, 1318] ("[Q]: Have you used the phrase "drain the blood"? [A]: No; [Q] Have you ever used the phrase "little bastards"? [A]: No, there is a cup that says 'don't let the little bastards get you down' in the kitchen; [Q] Do you ever berate your staff in public? [A] Never, I always speak to them privately … I don't yell or scream. I explain when someone does something wrong.")

Aside from the fact that Zarza was brought in this mess for having advocated on behalf of one of her disabled subordinate employees, the DRC ignored other evidence of Zarza's egalitarianism that contradicted the purported allegations brought against her. [*Id.*, PageID. 1318] ("[Q: Do you let Iyad leave early? [A] No. He is a muslim [sic] and he celebrates his religious things. I was able to allow him to go early to that.")

The DRC also ignored allegations that should have actually been directed at Brancheau and not Zarza. *Id.* ("[Q.] Was D-----'s behavior [sexual harassment] addressed? [A.] I don't make decisions regarding corrective action. **Kristin Brancheau** does that.") (emphasis added).

At a minimum, such disputes involving bias and intent to retaliate are questions for a jury that should preclude summary judgment.

To make matters worse, the DRC committee also received input from Brancheau and Lawter concerning the disposition of Zarza's employment. [Brancheau tr. 99:4-100:25, R.48-18, PageID.1183-84]. Again, Zarza submitted a retaliation complaint against Lawter for threatening her after she initially presented her disability advocacy discrimination complaint and submitted a retaliation complaint against Brancheau for conducting the retaliatory and pretextual misconduct investigation against Zarza with Rastigue. [R. 48-14, PageID.1153-54]; [Brancheau/ Rychlinski

email exchange, R. 48-43, PageID.1313] (Brancheau concedes that Zarza "thinks we are doing this because she is testifying for Robert").

UM admits that Brancheau and her "investigative" report ultimately influenced the committee's decision to terminate Zarza. Not only did Brancheau communicate to Owens that she recommended termination, [Brancheau tr. 99:11-12, R. 48-18, PageID.1183], but UM admitted it relied on Brancheau's report and the four findings she made in that report as support for its recommendation to terminate Zarza. [termination letter, R. 48-13, PageID.1150]. Brancheau's admitted influence on the DRC is also enough to preclude summary judgment because it is an issue for the trier of fact as to whether UM would have terminated Zarza absent Brancheau's contaminated investigation. *See Johnson v. Arkansas State Police*, 10 F.3d 547, 554 (8th Cir. 1993) (potential bias contamination in an internal investigation is critical to whether employer acted in a discriminatory manner when it terminated plaintiff).

Additionally, while the contemporaneous documentation establishes the fact that UM intended on terminating Zarza's employment prior to the DRC, her termination letter falsely indicates that Zarza was "given the opportunity to respond or provide relevant evidence to refute the charge(s)" in the DRC. *See e.g.,* [Owens/ Brancheau email regarding Miller; R.48-44, PageID.1320]; [termination letter, R.48-13, PageID.1150]. To that end, UM refused to interview one of Zarza's witnesses, Miller, because she was a co-worker (and not subordinate) of Zarza where "it is to

be expected that she treats (Miller) better than her" subordinates, **yet based their termination decision on how Zarza allegedly treated another coworker in Price**. [Rastigue/ Owens email exchange regarding Miller, R.48-45, PageID.1320]. Clearly, UM's DRC investigation was a sham and evidence layers of pretext.

### c.    UM's proffered reason is insufficient to explain Zarza's termination.

Aside from the aforementioned avalanche of pretextual evidence, there is also significant evidence that UM's proffered reason was insufficient to explain Zarza's termination which, on is own, is also evidence of pretext.

### i.    Christmas Eve Breaks

Brancheau's first investigative "finding" concerning Zarza "bull[ing] and berate[ing] people," and identifies one listed example which Brancheau refers to as the "main example"—namely that Zarza did not give her subordinate employees a half-day shift for Christmas Eve. [Investigative Report, R.48-19, PageID.1221]. Owens, however, admitted that it was not a requirement to give staff Christmas Eve off. [Owens tr. 122:25-123:2, R. 48-8; PageID.1095-1096]. Furthermore, UM failed to provide any comparator evidence of UM ever terminating any other supervisors because they did not provide Christmas Eve off. *See Duchon v. Cajon Co*., 791 F.2d 43, 46 (6th Cir. 1986). A reasonable juror can find by a preponderance of the evidence that UM's "main example" is insufficient to explain Zarza's termination.

### ii.    UM's "bullying" complaints are insufficient to justify

**<u>Zarza's termination.</u>**

UM's bullying complaints are also insufficient to justify Zarza's termination. First, Price complains that Zarza smoked cigarettes during breaks with another subordinate employee, Iyad Joma. [R. 48-19, PageID.1211]. Smoke breaks, however, were allowed in designated areas and privately-owned vehicles. [UM Smoking Policy, 48-24, PageID.1244]. Zarza was never previously reprimanded for taking a smoke break, and there is nothing prohibiting her from smoking with a subordinate employee. [Donner tr. 42:21-23, R. 48-5, PageID.1048]. This is also not an example of "bullying Price."

Second, aside from accusing Zarza, Price also accused Miller of taking his keys. [R. 4f8-19, PageID.1214]. Miller, however, was not disciplined or investigated for same. [Miller tr. 68:4-17, R. 48-9, PageID.1113]. *See Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994) (A Plaintiff can also show pretext through comparator evidence).

Third, Price complains that B.H. accused Zarza of harassing another custodian. [R. 48-19, PageID.1210].[15] The "harassment" B.H. accused Zarza of was that on two occasions, Zarza asked another custodian who smelled like marijuana if he recently smoked marijuana. [R. 48-19, PageID.1210]. While Price reiterates this baseless

---

[15] Significantly, this complaint was purportedly made immediately before "B.H.", was terminated from employment for sexually harassing Zarza in 2016. [Brancheau tr. 223:5-11, R.48-18, PaeID.1206].

complaint **from 2016** in Brancheau's pretextual investigation, Owen admits that marijuana use was a terminable offense, and Rastigue admits that it is not a violation of UM policy to investigate someone who is suspected of taking drugs. [Rastigue tr. 78:6-13, R. 48-27, PageID.1259].

Fourth, the District Court reached its Opinion based on Brancheau's investigative notes concerning Terry Leach's interview, where Leach purportedly advised Brancheau that he lied to her when Brancheau interviewed him in 2012, and that he was actually "terrified of retaliation from" Zarza. [R. 54, PageID.1377]. The District Court erred in making a credibility determination in accepting Leach's 2017 testimony, which was in direct contradiction to his 2012 testimony, for purposes of summary judgment.

### iii.    Zarza did not bully the temporary staff.

Brancheau's investigative report claims that Zarza worked the temporary employees "to death." [R. 48-19, PageID.1213]. When asked about this accusation in her deposition, Brancheau testified:

> Q. Okay. So how did [Zarza] work the temps to death?
> A. The explanation that [Price] gave was that they have to work like the whole time they're there. They're the ones that do all like the crap jobs … like they would do all the restrooms … they work all the time, whereas like the permanent staff would get like the breaks and sometimes extended breaks, whereas the temps would not get that.
> . . .
> Q. So which temps did she not let take breaks.
> A. He didn't say that she didn't let them take a break. … [Price said] she just makes them – you know, like a permanent employee, if they have

a 30-minute lunch, maybe they took 40 minutes, whereas temps would
be held to the standard that everybody should be held to of, you know,
leaving after 30 minutes.

[Brancheau tr. 129:10-23; 130:21-131:3 R. 48-18, PageID.1189-1191]. While

Brancheau admittedly spoke to the temps, she failed to ask them about their breaks

to verify Price's claim. *Id.* at 131:8-17.

Brancheau also claims that the temps were required to complete the "crap

jobs," such as cleaning the bathroom, but admitted in her deposition that the temps

can clean the restrooms. [Brancheau tr. 201:22-23, R.48-18, PageID.1199]. UM's

false accusation of Zarza bullying the temps is frivolous and not capable of objective

evaluation.

> ### iv.    Disgruntled employee complaints are insufficient to justify termination.

The complaints UM manufactured against Zarza from her subordinate

employees are insufficient to justify termination, as demonstrated through

comparator evidence.  For example, before Zarza advocated on behalf of Taylor and

in 2012, similar complaints were presented against Zarza, and rejected by Lawter,

Owens and Brancheau:

> "So when all the employees went to the union and wrote letters and it
> was escalated up to [Owens] and [Owens] said, 'What are we going to
> do about this, this is not the first time I've been hearing about concerns
> about her style of leadership,' [Lawter] said, you know, '**Oh, it's
> disgruntled people**,' or 'They won't talk now,' and he just kind of
> dismissed the whole thing."

[Brancheau Tr. 144:7-13, R. 48-18, PageID.1194] (emphasis added). As a result, UM "decided to do no discipline based on" this incident. *Id.* 143:23-144:2, PageID.1194-1195. Instead, after the 2012 investigation, Zarza was recommended for promotion. [2016 Email, R.48-35, PageID.1292-1293]. UM understands that these sorts of complaints are routinely made against supervisors and merely reflect "disgruntled" subordinates that exist in every organization but are insufficient to justify discipline—let alone termination—unless UM elects to weaponize such complaints as a pretextual justifications for termination.

## III. District Court erred in making credibility determinations in the light most favorable to UM.

In reaching its Opinion, the District Court made credibility determinations in contravention of *Anderson,* 477 U.S. 242. Specifically, the District Court found that Brancheau was not biased and acted out of concern for Price. [MSJ Order, R.54, PageID.1381-1383] ("Brancheau's investigation into Plaintiff's misconduct was the direct result of a genuine concern of Price"). In so doing, the District Court drew all reasonable inferences in favor of UM and significant evidence of bias involving Brancheau. *See e.g.,* [R. 48-14 PageID.1158] (Asking if UM could discipline Zarza once the evidence showed Zarza was wrong regarding the failure to accommodate Taylor).[16]

---

[16] The District Court found this email exchange did not evidence bias and that a reasonable jury would not find that this exchange demonstrated "ill will" because

Similarly, in *Strothers v. City of Laurel, Maryland,* 895 F.3d 317, 330 (4th Cir. 2018), the court also ignored evidence of potential bias by drawing all reasonable inferences in favor of the moving party. In *Strothers*, the district court credited a supervisor's testimony that she hired a white candidate not because of race but because or prior work experience. *Id.* "The district court then concluded that [the supervisor] preferred the white candidate for legitimate reasons; it was only coincidental that the preferred candidate happened to be white and the employee who was subjected to unwelcome conduct happened to be black." *Id.* The Fourth Circuit, however, held that "a reasonable jury could well conclude that [the supervisor's] reason for preferring the white candidate was pretextual." *Id.*

Here, too, the District Court only sought one singular interpretation of Brancheau's comments and actions. [Order, R. 54, PageID.1382-83]. When viewed in the correct light most favorable to Zarza, a reasonable jury could well conclude that Brancheau was biased and acted out of retaliatory animus—especially since she, as an HR professional, ignored UM's policies. *Asmo*, 471 F.3d at 595; *Heaton v. The*

---

Owens qualified her statement with "if the evidence shows." [Order, R. 54, PageID.1383, n. 14]. A reasonable jury, however, could find that two HR professionals should've known that a complaint of discrimination is protected conduct regardless of what the evidence shows as long as the complaint was made in good faith. *Meeks v. Computer Assocs. Int'l.,* 15 F.3d 1013, 1021 (11th Cir.1994) (quoting *Tipton v. Canadian Imperial Bank,* 872 F.2d 1491, 1494 (11th Cir.1989) ("To recover for retaliation, the plaintiff 'need not prove the underlying claim of discrimination which led to her protest,' so long as she had a reasonable good faith belief that the discrimination existed.")

*Weitz Co., Inc.*, 534 F.3d 882, 890-891 (8th Cir 2008) (upholding jury verdict and punitive damages award because reasonable jury could believe investigator was biased and the investigation a sham).

## CONCLUSION/PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Zarza respectfully prays that this Court reverses the District Court's Order Granting UM's Motion for Summary Judgment and remand this matter for trial on the merits.

Dated: November 14, 2022

Respectfully submitted,

/s/ *Michael N. Hanna*
Michael N. Hanna
Mich. Bar No. P81462
Morgan & Morgan P.A.
2000 Town Center, Suite 1900
Southfield, MI 48075
(313) 251-1399
MHanna@forthepeople.com

Adria Lynn Silva
Florida Bar No. 0137431
Morgan & Morgan, P.A.
8151 Peters Road, 4th Floor
Plantation, Florida 33324
954-327-5367 Office
asilva@forthepeople.com

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)

1.      This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains 12,513 words excluding the parts of the brief exempted by Fed.R.App.P. 32(f), and 6th Cir.Rule 23(b).

2.      This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word 10 word processing, and 14 point Times New Roman type.

*/s/ Michael N. Hanna*

## CERTIFICATE OF SERVICE

The foregoing Brief of Appellant was electronically filed on November 14, 2022. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Michael N. Hanna*

**ADDENDUM**

| Description | Record Entry | Page ID |
|---|---|---|
| Plaintiff's Retaliatory Termination Complaint | R. 1 | 1-18 |
| Answer to Complaint | R. 16 | 199-213 |
| UM's Motion for Summary Judgment, with attached exhibits | R. 44 | 749-780 |
| Karen Zarza Deposition Transcript | R. 44-11 | 886-894 |
| Vershawn Miller Deposition Transcript | R. 44-12 | 895-899 |
| Plaintiff's Response in Opposition to UM's Motion for Summary Judgement, with attached exhibits | R. 48 | 961-1323 |
| Consent Decree | R. 48-02 | 1006-1020 |
| David Masson Deposition Transcript | R. 48-03 | 1022-1027 |
| Robert Taylor's *pro se* Complaint | R. 48-04 | 1029-1044 |
| Colette Donner Deposition Transcript | R. 48-05 | 1045-1069 |
| Karen Zarza Deposition Transcript | R. 48-06 | 1079-1081 |
| Zarza Performance Review | R. 48-07 | 1085 |
| Sabrina V. Garrett-Owens Deposition Transcript | R. 48-08 | 1089-1106 |
| Vershawn Miller Deposition Transcript | R. 48-09 | 1107-1118 |
| Ken Sawicki Deposition Transcript | R. 48-10 | 1120-1123 |
| Zarza May 10, 2017 Email | R. 48-11 | 1125 |
| John Lawter Deposition Transcript | R. 48-12 | 1126-1148 |
| Termination Letter | R. 48-13 | 1149-1150 |
| Zarza Email to Masson | R. 48-14 | 1151-1156 |
| 5-16-17 Email | R. 48-15 | 1157-1158 |
| Letitia Rastigue Deposition Transcript | R. 48-16 | 1159-1171 |
| Kristin Brancheau Deposition Transcript | R. 48-18 | 1179-1208 |
| Brancheau Report | R. 48-19 | 1209-1221 |
| Taylor Litigation Hold Letter | R. 48-20 | 1222-1225 |
| Brancheau's Notes | R. 48-21 | 1226-1227 |
| Scott Price Deposition Transcript | R. 48-22 | 1228-1238 |
| Terry Leach Deposition Transcript | R. 48-23 | 1239-1242 |

| | | |
|---|---|---|
| Zarza Email Complaint to Laurita Thomas on September 15, 2017 | R. 48-34 | 1288-1290 |
| Brancheau email to Masson re: Plaintiff's Retaliation Allegation on September 18, 2017 | R. 48-36 | 1294-1296 |
| Masson email asking about retaliation investigation on September 18, 2017 | R. 48-37 | 1297-1298 |
| Email Exchange between Owens and Rastigue on September 18, 2017 | R. 48-39 | 1300-1301 |
| Defendants' Strategy Email | R. 48-42 | 1307 |
| Email Exchange between Brancheau and Rychlinski | R. 48-43 | 1312-1315 |
| Rastigue DRC Notes | R. 48-44 | 1316-1318 |
| Email exchange between Brancheau and Owens re: Vershawn Miller | R. 48-45 | 1320 |
| Settlement Agreement | R. 48-46 | 1321-1323 |
| Order Granting Motion to Substitute Parties | R. 50 | 1333 |
| Order Granting Plaintiff's Unopposed Motion to Substitute a Party | R. 50 | 1333 |
| Defendant's Reply Brief | R. 51 | 1334-1341 |
| Notice of Hearing | R. 52 | 1353 |
| Final Order Granting Summary Judgment | R. 54 | 1355-1384 |
| Order Granting UM's Motion for Summary Judgment | R. 54 | 1355-1384 |
| Final Judgment | R. 55 | 1385 |
| Plaintiff's Notice of Appeal | R. 56 | 1386-1388 |